**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Michael LANE, Defendant-Appellant.**

**No. 40511.**

Missouri Court of Appeals,
Eastern District,
Division One.

Jan. 27, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 13, 1981.

**670**

Doris Gregory Black, St. Louis, for defendant-appellant.

John Ashcroft, Atty. Gen., Paul Robert Otto, James R. Cumbee, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

KELLY, Chief Judge.

Michael Lane (hereinafter the appellant) was convicted of Manslaughter, § 559.070 RSMo. 1969,[1] and sentenced in the Circuit Court of the City of St. Louis to a term of ten (10) years in custody of the Missouri Department of Corrections. He appeals. We affirm.

While appellant presents five Points Relied On as grounds for reversal of his conviction and remand to the Circuit Court for a new trial, he does not contest the sufficiency of the evidence to support the conviction. For these reasons a detailed statement of the evidence is unnecessary at this stage of the opinion; however, where necessary to a decision on the issues presented in those Points he has raised, the relevant facts will be set out.

There was evidence supportive of the jury verdict that on Saturday evening, July 31, 1976, appellant met the victim, Karen Terry, at approximately 8:30 p. m. at the Town Hall Lounge, 4509 Laclede Avenue in the City of St. Louis. He did not know her prior to this time, but nevertheless, agreed that she could use his apartment for purposes of obtaining earnings by prostitution. He gave her an extra key for the apartment which she was to return to him later that morning.

Ms. Terry's body was found in a garage located at 4562 Laclede Avenue on Sunday morning, August 1, 1976, sometime around noon. The body had a wound under the left breast and another on the left arm at the elbow. A red towel, tied as a tourniquet, was situated above the wound on her left arm. Cause of death was traumatic external hemorrhage due to the perforation of the ulnar artery of the left forearm due to a shotgun wound; the wound under the

---

1. All statutory references are to RSMo. 1969 unless otherwise noted; all references to Rules of the Supreme Court are to those Rules in effect at the time of trial unless otherwise noted.

breast was superficial and non-contributory to Ms. Terry's demise. Exact time of death could not be determined.

When searching the premises where the victim's body was found, on August 2, 1976, a spent 20 gauge shotgun shell was found in the rear yard at 4546 Laclede Avenue and retrieved by Officer Pierce Conley of the Evidence Technician's Unit of the St. Louis Metropolitan Police Department. On the same day, a roofer repairing the roof at 4545 Forest Park Boulevard, reported to the police that he found a shotgun shell and a pair of purple and white panties on the roof at that address and that neither of these had been on the roof on the previous Friday when he had last worked there. In response to this telephone call, at about 11:00 or 11:30 a. m. Detective McCoy went to the roof of the apartment building at 4545 Forest Park Boulevard and found the ladies panties and the spent shotgun shell on the roof of the building directly over Apartment 416.

Later that evening the police officers came to appellant's apartment and conducted a search of same in his presence. They found what appeared to be bloodstains and bone fragments along the baseboard of one of the rooms and an iron with what appeared to be bloodstains on it in the kitchen of the apartment. An apparent gunshot blast was observed on the interior side of the door to the apartment and they observed that a large hole in the wall in the living room-bedroom area had been patched. A 20 gauge shotgun was removed by the appellant from a box of clothing in front of the couch in this area and handed over to the police officers. Ballistics tests revealed that the two spent shotgun shells found by the police in the adjacent yard and on the roof directly above appellant's apartment were fired by the shotgun recovered in his apartment. Blood scrapings removed from appellant's apartment were of the same blood type as that of the victim.

After he was arrested, appellant denied killing Ms. Terry. He admitted finding her in his apartment when he returned there the morning of August 1, 1976, and told the officers that he assumed she was dead. He looked around the apartment and noticed that his shotgun was broken in half and was lying on the living room floor. He removed the body from the apartment to the garage where it was found, and then returned to the apartment and proceeded to clean the blood off the floor and walls. He also observed the shotgun blast in the door. He taped together his broken shotgun. Later the same day, after learning the police were investigating the homicide, he went to the 9th District Police Station and turned himself in.

Appellant's initial Point is that the trial court erred in overruling his motion to suppress and in allowing into evidence the items seized in his apartment as well as photographs of these items and of his apartment because they were the product of a warrantless and illegal search in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Art. I, § 15, Constitution of Missouri.

Defendant's Motion to Suppress was directed against "three drinking glasses, one iron, apparent blood samples, apparent bone fragments, pieces of rug, pieces of wood, an earring, shotgun pellet, 20 gauge Westerfield shotgun, 20 shotgun shells, man's T-shirt, wash cloth, broken chair, mop, statement of defendant, . . ." Separate evidentiary hearings were conducted by different judges of the same Circuit Court on the question whether the physical evidence should be suppressed and whether his statement should be suppressed. A third judge of the same circuit ruled on the admissibility of these evidentiary items during the course of trial.

At the hearing on the suppression of the physical evidence, conducted about five months prior to trial, only one witness, Detective Colin McCoy, testified. According to his testimony he became involved in the case on August 1, 1976, when he responded to the report of a homicide and went to the scene of the crime where he interviewed some people in the neighborhood. On August 2, 1976, after receiving a call that there were some items on the roof of a

building at 4545 Forest Park Boulevard which might possibly be linked to the victim of the murder, he and his partners, Sgt. Rowan and Det. Divier, went to 4545 Forest Park Boulevard at about 11:30 a. m. and recovered a pair of women's panties and a spent shotgun shell from the roof of the apartment building. From the location of these items on the roof of the apartment he concluded that they were thrown from the apartment directly below, apartment number 416.

The manager of the apartment building was contacted and she informed him whose apartment it was and furnished him with a key to the apartment. He and his partner went to the apartment, knocked on the door a couple of times and then went back downstairs to the lobby and waited around. In all they returned to the apartment three or four times during the day and knocked on the door and returned to the lobby when no one answered.

The defendant, accompanied by two detectives from the Ninth District Police station arrived at the apartment building lobby at about 7:00 or 7:30 p. m. He did not recall whether appellant was in handcuffs at that time.

Up to this time no search warrant had been applied for because he didn't feel that they had enough evidence to get one—"We didn't know, . . ., exactly what we were looking for." However, in the eyes of Detective McCoy appellant was a possible suspect in this homicide case.

After the appellant arrived in the lobby of the apartment building he was informed of the fact that a pair of ladies' panties and a spent shotgun shell had been found on the roof and that people there in the apartment complex had informed the police officers that appellant had been under an eviction notice to move because of the fact he'd been flourishing a shotgun around his apartment, that they were investigating the murder which had occurred across the alley from the apartment complex, and were waiting to find out if they could search his apartment. Appellant replied they could. He was advised that if they did find anything that would be of value to the case he would then be placed under arrest. Detective McCoy then wrote out a consent to search form which he gave to the appellant and had him sign just prior to entering the apartment. Appellant opened the door to the apartment with his key and he and the police officers entered. No police officer had his gun drawn prior to their entering the apartment.

The apartment was described as an "efficiency apartment" and consisted of a small kitchen off to the left of the entrance hallway as one entered; off to the right of this hallway was a bathroom; and from the hallway one goes into a living room-bedroom combination. There is one entrance to the apartment and it is from a walkway on the outside of the building facing the alley.

The police officers found a rug with apparent blood stains on it, some broken furniture, and the back of the door leading to the walkway outside of the apartment had what appeared to be a shotgun blast in it. They also found a 20 gauge shotgun, some shotgun shells, and three drinking glasses. The shotgun and shells were located in a large cardboard box which was apparently being packed and which gave the appearance of someone getting ready to move. A man's T-shirt, a washcloth, some broken china and a mop were also observed in the apartment. The Evidence Technician Unit was called; Officer Conley of that Unit came to the scene and took custody of the items of evidence heretofore described. He also took blood scrapings and the bone fragments found in the apartment. Detective McCoy testified that one could not observe the shotgun blast holes in the door to the apartment from the outside; they could only be seen from inside the apartment.

With the conclusion of this testimony and after hearing comments from appellant's counsel, the court overruled the motion to suppress physical evidence, "with the exception of the statement of defendant which is to be heard at the time of trial, . . ."

Thereafter, on November 14, 1977, when the cause came on for trial, a hearing on

appellant's motion to suppress statement was held by a second judge of the court. The evidence at this proceeding was limited, for the most part, to evidence concerning the circumstances surrounding the statement made to the detectives at police headquarters, to ascertain whether appellant had been given his *Miranda* warnings, and whether his statement was given with an intelligent and knowledgeable waiver of his constitutional rights under the Fifth Amendment. At one point in the testimony of Sgt. Young and Detective McCoy, appellant's counsel attempted to inquire into the activities of those officers prior to the time appellant was brought to the apartment by the Ninth District Police Officers, and, more particularly, whether they had obtained a key to appellant's apartment from the manager of the apartment building. In each instance an objection of the Assistant Circuit Attorney to this line of inquiry on the grounds that it was immaterial, irrelevant and had no bearing on the motion to suppress statements was sustained and counsel withdrew the question. During the course of Detective McCoy's testimony, however, he testified that the consent to search form signed by appellant whereby he consented to a search of his apartment, was executed by the appellant in the lobby of the apartment building prior to going upstairs to the apartment and conducting the

search. The motion to suppress was overruled. The cause proceeded to trial, and on November 16, 1977, culminated in a mistrial.

Ultimately, on February 14, 1978, the cause came on for trial before a third judge of the circuit, and during the course of the trial it was developed in the testimony of Detective McCoy that at approximately noon on August 2, 1976, he and Sgt. Young obtained a key to the appellant's apartment from the apartment manager and went to the apartment, opened the door and conducted a cursory inspection of the apartment for the purpose of ascertaining if the appellant still resided there. After ascertaining that appellant was not present in the apartment, Detective McCoy immediately left and returned to the lobby to await appellant's return.

■ Appellant initially argues that the police officers had no valid excuse for entering his apartment the first time because they had no search warrant; that there were no exigent circumstances justifying a warrantless search; and that said search was not conducted incident to a lawful arrest. The prosecution, on the other hand, argues that the initial entry into appellant's apartment was proper because it came within the "emergency" exception, and therefore a warrant was not required.[2]

---

2. Appellant not only relies on the evidence adduced on the motion to suppress physical evidence, but also on evidence subsequently adduced at the hearing on the motion to suppress statements and that developed at trial. As the Southern District of this court pointed out, in a footnote in *State v. Worthon*, 585 S.W.2d 143, 146, 147 (Mo.App.1979), whether we are required or even authorized to consider testimony relative to the validity of a search and seizure adduced on that issue at trial as well as that offered upon the hearing on a motion to suppress evidence seized in the course of an alleged unconstitutional search has not been fully developed in this state. In *State v. Gailes*, 428 S.W.2d 555, 559[5] (Mo.1968) the court said, "When a motion to suppress evidence is overruled in a pretrial hearing the only determination for the trial court at the trial proper is 'whether the confiscated evidence is competent and relevant.'" And in *State v. Johnson*, 463 S.W.2d 785, 786 (Mo.1971) the court said, "The legality of a seizure of property is to be deter-

mined from the evidence adduced on the motion to suppress the evidence; * * *; and with the ruling on that motion, the question concerning the lawfulness of the arrest and the validity of the search went out of the case, except for appellate review." However, in *State v. Howell*, 524 S.W.2d 11, 19[6] (Mo. banc 1975) the court said, "A trial court's ruling on a motion to suppress evidence prior to trial is, in a sense, interlocutory in nature. The real damage is not done until the evidence is introduced in the trial of a case for consideration by a jury. Thus, a trial court can receive additional evidence and change its ruling prior to admitting the objected-to items in evidence before a jury." *State v. Pugh*, 600 S.W.2d 114, 117[3] (Mo.App.1980). Further, in *State v. Hohensee*, 473 S.W.2d 379, 380[1] (Mo.1971) the court said, "In ruling this point (that defendant's arrest was without probable cause and hence his motion to suppress evidence should have been sustained) on appeal we will consider all of the evidence bearing on the question."

We have no doubt that the initial intrusion into appellant's apartment by the police officers, was, under the facts in this case, a violation of the guarantees of the Fourth Amendment to the United States Constitution and Article I, § 15 of the Constitution of the State of Missouri. While the exigency exception to the warrant requirement of the Fourth Amendment has been expanded to the point that its guarantees against unreasonable searches and seizures have almost been dissipated, we have found no case where an entry of the kind we have here has been approved.

The state's contention that this warrantless search falls into one of the exceptions to the warrant requirement, the emergency exception, and reliance on *State v. Epperson*, 571 S.W.2d 260 (Mo. banc 1978) and *State v. Sutton*, 454 S.W.2d 481 (Mo. banc 1970) in support of this argument is, in our opinion, unwarranted for reasons hereinafter stated.

It would serve no purpose to review the genesis of the emergency exception to the Fourth Amendment's guarantee against unreasonable searches and seizures. Anyone interested may refer to Sutton, supra, and *Stevens v. State*, 443 P.2d 600 (Alaska 1968). Each case must be decided on its own facts and circumstances in deciding whether the warrantless search and seizure can be brought under the umbrella of the emergency exception.

The court in *Epperson* found the following circumstances brought that case within the emergency exception: "... (1) the defendant's wife and children had been missing several days; (2) defendant had given false and inconsistent explanations for their absence; (3) defendant's unusual, suspicious and nervous manner in the days following the disappearance of his family; (4) an odor of decomposing flesh had been detected in the house, and (5) defendant's unexplained disappearance, although he had been in the house with Mrs. Smith (victim's mother) shortly before the police arrived."

In *Sutton*, supra, a telephone operator received a call from a man who identified himself as the defendant's husband and stated that he had been shot by his wife and needed help. The telephone operator called an ambulance owner-operator and reported to him her conversation with Mr. Sutton and he in turn called the town marshal, informing him of the situation. The town marshal in turn called the sheriff who agreed to meet him at the Sutton residence. The ambulance arrived first; Mr. Sutton was found on the kitchen floor, unconscious; he was then conveyed from the home to the hospital. Shortly after, the town marshal arrived, but he waited for the sheriff to arrive before entering the house. When the sheriff did arrive, he and the marshal went into the house, which was unlocked and no one was in it at that time. Upon entering the house they immediately observed the rifle which was photographed, seized and later, at trial, introduced into evidence. In approving this entry and search the court, l. c. 484, said: "... their entry and subsequent observations were justified by the exigencies of the situation and in fact demanded by the nature of their duties as peace and law enforcement officers." [3]

The circumstances the state relies on to fit this case under the emergency umbrella are "that a grave offense was involved and the circumstances of the entry were peaceable;" the officer spent only a few seconds in the apartment, was there for the sole purpose of ascertaining whether appellant still lived there, and as soon as he ascertained that fact he left. We believe more is necessary to justify a warrantless intrusion into the living quarters of a citizen under the emergency exception to the Fourth Amendment's bar against unreasonable search and seizure. The court in *Root v. Gauper*, 438 F.2d 361, 364[8] (8th Cir. 1971) defined the emergency doctrine as follows: "... police officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that

3. Because of the circumstances in the case, the search in Sutton was subsequently ruled unconstitutional. *Root v. Gauper*, cited and discussed in the body of this opinion.

assistance. In applying this doctrine, two principles must be kept in mind. (1) Since the doctrine is an exception to the ordinary Fourth Amendment requirement of a warrant for entry into a home, the burden of proof is on the state to show that the warrantless entry fell within the exception * * (2) An objective standard as to the reasonableness of the officer's belief must be applied." In *Epperson* there was reason to believe there might be a dead body or bodies in the defendant's home. In *Sutton* there was information that someone had been shot in the home occupied by the defendant and the victim of the shooting; in *Stevens,* supra, the local chief of police was summoned to the house by a telephone call from a neighbor, went to the appellant's house, knocked on the door, and when appellant's wife opened the door, entered. No words were spoken by either the chief of police or appellant's wife prior to this entry. Appellant was sobbing and told the chief of police that he had shot his "buddy." The body of the victim was in the house at that time.

This court, in *State v. Timmons,* 574 S.W.2d 950 (Mo.App.1978) approved a warrantless intrusion into a house occupied by four young male tenants after the police who entered the house had been informed by the victim, an eleven year old boy, and his father, that the youth had been assaulted and mistreated in the basement of the house. When the police officers knocked on the front door to the house someone inside yelled something and the police observed through the glass in the door that the occupants of the house were starting to scatter. Thereupon the police entered the house believing, on the basis of information furnished them by the young boy, that a crime had been committed therein and with the intent of arresting the criminal if he were still present in the house. One of the officers went to the basement, realized he was at the scene of the crime, and observed a shotgun in plain view and the sneaker the victim reported he had lost at the scene of the crime. The police officers took possession of both the shotgun and the sneaker.

This intrusion without a warrant for arrest or to search was held to be imperative because of the exigencies of the situation. The circumstances justifying this search were: (1) the grave nature of the offenses—kidnapping and assault with intent to do great bodily harm without malice—(2) the perpetrator of the crime might still be armed with the weapon used in the commission of the crime, (3) the officers who entered the house had reasonably trustworthy information that a suspect was an occupant of the property and was probably in the house, (4) there was at least a likelihood that a delay might permit escape, when and if the suspect came to realize that his victim had freed himself of his bonds and left the house, and (5) the police officers were justified in looking for the culprit at home at about 9:45 p. m.

In the instant case Detective McCoy admitted that at the time he entered appellant's room without a warrant he did not have sufficient probable cause to apply for and obtain a search warrant. He had some suspicions about appellant, based upon the finding of a pair of ladies' panties and a spent shotgun shell on the roof over appellant's apartment, and information that appellant had been seen flourishing a shotgun around the apartment building at some unspecified time. No one answered when he knocked on the door. These circumstances, in our opinion, do not bring this intrusion into appellant's apartment within the "emergency" exception to the Fourteenth Amendment to the United States Constitution nor Article I § 15 of the Constitution of the State of Missouri, and we so hold.

However, this does not conclude the question whether the trial court erred in admitting into evidence the challenged items of evidence seized later that day.

We must now consider with the subsequent search of the premises by the police officers was valid because it was done with appellant's consent, and if so, whether the evidentiary items were properly admitted despite the earlier illegal intrusion into appellant's apartment.

Appellant argues that the second search could not "cure" the original search because the alleged consent to search was involuntary. The state, on the other hand, contends that, viewed in the totality of the circumstances, the judge who heard the appellant's motion to suppress physical evidence ruled correctly in overruling the motion because the state met its burden of proving that the consent was voluntarily and freely given.

■ The factors to be considered in deciding this issue are the following: the number of officers present, the degree to which they emphasized their authority, whether weapons were displayed, whether the person was in custody, whether there was any fraud on the part of the police officers, the acts and statements of the consenter, and other matters comprising the totality of the circumstances. *State v. Pinkus*, 550 S.W.2d 829, 835[4] (Mo.App.1977); *State v. Berry*, 526 S.W.2d 92, 98[13] (Mo. App.1975); *State v. Rush*, 497 S.W.2d 213, 215[8] (Mo.App.1973).

■ In deciding this Point it is not necessary to again set out the facts adduced at the proceedings preliminary to and at trial. We conclude that under that evidence the state met its burden of proving that consent to the search of Apartment 416 was, in fact, freely and voluntarily given. Appellant, at the time he executed the consent to search form, was 26 years of age, had a G.E.D. High School Equivalency Certificate he'd been awarded in 1974. He was not a novice in the system of criminal justice, having been previously convicted of criminal offenses on prior occasions. He admitted that he understood the English language and understood what was going on at the time. He admitted during his testimony at trial that he told the detectives they could search his room before they went upstairs and he admitted signing the consent to search form.

■ Appellant argues that the fact that he was not warned that he had a right to refuse to consent to the search of his apartment is a factor to be considered in the totality of the circumstances on this question. There is no specific requirement that a person consenting to a search must be specifically advised of his Fourth Amendment rights by the police officers desirous of conducting the search, or that it be shown that he was already aware of those rights. *State v. Rush*, supra, l. c. 215[7]. The absence of the warning is simply another factor to be considered in the ultimate determination of the issue as one of the circumstances in the "totality of circumstances." *State v. Berry*, supra, l. c. 98[12].

Appellant also relies on conflicts in the testimony of the police officers relative to when, in point of time, he signed the consent to search form. We have already pointed out these inconsistencies. At the hearing on the motion to suppress physical evidence Detective McCoy testified that appellant signed the form just prior to entering the apartment; at the hearing on the motion to suppress statements he testified that appellant signed the form in the lobby of the apartment building prior to taking the elevator upstairs to the apartment. At trial, he testified that the form was signed by the appellant before they entered the apartment. Sergeant Young, who did not testify at the hearing on the motion to suppress physical evidence, testified at the hearing on the motion to suppress statements but was not interrogated on this point. At trial, the Sergeant testified that the form was signed by the appellant after they had gone into the apartment. His signing of the consent form was merely physical evidence of the fact that appellant did consent to the search and whether it was signed prior to entering the apartment or subsequent thereto is of little consequence in the totality of the circumstances.

Conflicts in testimony are for the court in motions tried to the court, and its determination of the credibility of witnesses will not be upset in the absence of manifest error. *State v. Rapheld*, 587 S.W.2d 881, 885[2] (Mo.App.1979).

We hold that under the evidence the trial court did not err in finding that the appellant did voluntarily and knowledgeably consent to the search of his apartment.

■ The question remains, however, whether the initial unlawful intrusion into appellant's apartment tainted the subsequent search and seizure of evidentiary items introduced into evidence at trial over appellant's objection, i. e., were they the "fruit of the poisonous tree" denounced in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920) and *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

We are of the opinion that the items seized were not the "fruit of the poisonous tree." The initial entry into appellant's apartment was for the purpose of ascertaining whether he still lived there. It was of short duration—"a minute"—and there is absolutely no evidence that Detective McCoy observed any of the items subsequently seized or photographed in the room and introduced into evidence at trial. The most damaging piece of evidence—the shotgun—was covered by some clothing in the box in the middle of the room when the appellant and the police officers entered the apartment and it was the appellant, himself, who, in his own testimony, stated that he uncovered the shotgun, removed it from the box and handed it to the police officers after they had entered his apartment with his consent. The evidence supports a finding that the intrusion into appellant's apartment was cursory, and, although in violation of appellant's Fourth Amendment rights, contributed nothing to the subsequent search and seizure other than causing the police officers to remain in the lobby awaiting the return of appellant whom they learned occupied the apartment. The shotgun shells were found in the same box in which the shotgun was found. There is no evidence that they were visible until after the appellant had removed the shotgun and, therefore, inferentially, at least, were hidden from Detective McCoy's view when he made his warrantless entry into the apartment and throughout the "minute" he remained therein.

We hold there is no merit to this Point and rule it against appellant.

Appellant next contends that the trial court erred in permitting the prosecutor to go into the circumstances of his prior convictions during cross-examination of appellant in violation of § 491.050 and for the purpose of attacking his lack of credibility.

During the presentation of his defense appellant took the stand and testified. His own counsel inquired whether he had been convicted of any crimes and when he responded in the affirmative, counsel then asked of what crimes he had been convicted. Appellant testified that he had been convicted of burglary in the second degree, stealing, and assault. His counsel then inquired:

Q. The assault did not involve a gun, did it?

A. No, it didn't.

Q. There were fists involved, right?

A. Yes.

Q. That did not involve a female, did it?

A. Yes, ma'am.

On cross-examination the prosecutor followed up on this line of inquiry and the following took place:

Q. Mrs. Black asked you on direct examination if your assault did not involve the use of a fist, did she not?

A. She asked me that question, yes.

Q. What did that assault you were convicted of involve, Mr. Lane?
   It did, Mr. Lane, did it not, involved a tire iron that you beat this young lady with?

A. The tire iron was never produced.

Q. Did you plead guilty to it, Mr. Lane? That's what I want to ask you.

MRS. BLACK: Your Honor, counsel is again inquiring to the matter of—I think we would have to put on the whole trial that has been settled.

THE COURT: I think I would overrule the objection.

(By Mr. Fischer):

Q. Did you, in fact, use a tire iron against that woman that night?

A. No, I didn't.

Q. Did you plead guilty and admit you used it against her?

A. I did.

Q. But you did not use it against her?

A. I did not.

Q. And that was while she was asleep in bed?

A. That was the way the situation was going.

Q. You pled guilty to that so you do, in fact, have a violent disposition towards women, do you not?

A. I don't.

Q. You do not?

A. No. I don't.

■ The standard against which this Point is to be gauged is that the "permissible scope of cross-examination is within the discretion of the trial court, not subject to appellate review absent a clear abuse of discretion of the trial court." *State v. Williams*, 492 S.W.2d 1, 4[2] (Mo.App.1973). In a criminal trial the state enjoys an absolute right to show, on cross-examination, prior convictions and the nature and kind thereof for the purpose of impeachment, limited only by the restriction, that, in doing so, the cross-examiner should not be permitted to go into details of the crimes leading to the prior convictions. It is permissible, however, to elicit the nature, dates and places of the occurrence and the sentences resulting therefrom. *State v. Sullivan*, 553 S.W.2d 510, 515[7] (Mo.App.1977).

■ Here appellant made the tactical decision to steal the state's thunder and adduce evidence of his prior convictions during his direct examination by his own counsel, who did, in fact, attempt to introduce evidence of the weapon used in the assault of which appellant had been convicted. She ruled out the possibility the jury might infer that a gun was used by the appellant in that assault and attempted to establish that the only means employed in assaulting the female who was the victim of that assault, was appellant's fists. There is no accusation that the prosecutor's reference to the use of a tire tool in this assault was not based upon information in his possession. Appellant, although denying the use of the tire tool, admitted to pleading guilty to the assault and made an equivocal statement when, in the course of his testimony, he said, "The tire iron was never produced."

We hold that under these circumstances the trial court did not commit error in overruling appellant's objection and allowing the prosecutor to cross-examine as he did. We rule this Point against appellant.

Appellant also contends that this judgment should be reversed because the prosecutor, during closing argument, high-lighted the details of his prior assault conviction.

■ It is established law in this state that the trial judge has wide discretion in permitting or rejecting closing argument by counsel. *State v. Swenson*, 551 S.W.2d 917, 919[1] (Mo.App.1977). Nevertheless, a prosecutor should not attempt to inflame the passions or prejudices of the jury against a defendant. *State v. Swenson*, supra, 1. c. 919[3]. The issue is whether the trial court abused its discretion in these matters. Before an appellate court will reverse a conviction by reason of improper prosecutorial argument an appellant must show such an abuse. *State v. Stamps*, 569 S.W.2d 762, 767[13] (Mo.App.1978).

We have examined the portion of the prosecution's argument referred to in appellant's brief in support of this facet of this Point and note that appellant's objection to this argument was sustained. Appellant did not ask for any further relief. Under these circumstances we find no trial error and rule this Point against appellant.

■ Appellant next claims error with respect to the state's closing argument; this time, to the prosecutor informing the jury that Ms. Terry's children were asking the jury to return a verdict against the appellant. Appellant argues that this argument covered matters not in evidence at trial, greatly prejudiced him, and was calculated to improperly inflame the jury against him.

We have set out in a footnote that portion of the prosecutor's argument against which this attack is directed.[4]

It is clear that the reference to Ms. Terry's children was in the context of an argument directed towards impressing the jury of the necessity and importance of effective law enforcement. While appellant contends he was prejudiced by this argument he has failed to point out exactly how he was prejudiced. A prosecutor, it has been held, may properly argue to the jury the necessity of law enforcement as a deterrent to crime and the evil results which might follow to society when a jury fails to do its duty. *State v. Heinrich*, 492 S.W.2d 109, 114[9] (Mo.App.1973). In an argument similar to this we are now reviewing, the court in *State v. Dooley*, 549 S.W.2d 677, 681[12] (Mo.App.1977), held that a fleeting reference to "our children" coming in the context of a plea by the prosecutor with respect to the importance of the jury's duty in the field of law enforcement was proper. The fact that Ms. Terry had two children was in evidence, having come in during Detective McCoy's testimony and appellant made no objection at the time.

We conclude that under the circumstances the trial court did not abuse its discretion in this instance.

Appellant's next Point is that the trial court erred in failing sua sponte, to declare a mistrial or grant a continuance when, during the testimony of Officer Pierce Conley, it was revealed that one of five or six latent fingerprints lifted from a number of glasses on the bar in the kitchen area of appellant's apartment was identifiable because this testimony was contrary (1) to information obtained by appellant during the course of discovery, (2) to Officer Conley's testimony at the first trial, and (3) caught appellant by surprise. Appellant also argues that this evidence could have affected the result of the trial had he known of it before trial, caused a miscar-

riage of justice, and violated his right to due process of law.

The basis for this Point surfaced during direct examination of Officer Pierce Conley, a member of the Evidence Technician Unit of the St. Louis Police Department, concerning fingerprints found on glasses seized from appellant's apartment on August 2, 1976. He testified that of six fingerprints found on these glasses, only one was identifiable, that it did not match either the appellant's nor the victim's fingerprints, and that he did not know to whom the fingerprint belonged. After the conclusion of Officer Conley's testimony on direct examination, and prior to commencing cross-examination of this witness, appellant's counsel informed the trial court, out of the hearing of the jury, that this testimony surprised her because, on the first occasion Officer Conley testified, he said there were no identifiable fingerprints taken out of appellant's apartment; that this was the first time she learned that there was an identifiable print obtained there, and that she had received no discovery with reference to this, and she was, therefore, totally surprised. A lengthy discussion followed and the prosecutor informed the trial court that the witness, at his request, checked the fingerprints that morning and learned that one of them was identifiable. He contended that he had made discovery but that he'd been informed by "Detective Rebouz," who worked for identification for a long time, that there would be no report made unless some identification of somebody had been made, and that's why appellant's counsel did not have this information. Counsel disagreed whether a report concerning latent fingerprints was given to appellant's counsel; however, she did recall that during the trial which ended in a mistrial, Officer Conley had testified that he did not say even one fingerprint was identifiable. Further discussion between counsel and the trial

---

4. This argument was: "I don't know what happened in there. It wasn't recorded on television. It wasn't recorded, unfortunately. We have put it back together the way it happened, and Karen Terry is dead and she'll never be back, but her kids are asking you people and the other citizens of this community are asking you people to hold this man accountable for this crime."

court revealed that appellant's counsel's prime concern was that, by her cross-examination of this witness on the fingerprint evidence, the jury might learn of the former trial and the trial court pointed out to her that this could be done without any direct reference to the former trial. The trial court went so far as to state for the record: "At the request of both of you, there will be no reference made to the prior trial. I'm not ruling, however, if it does come out that it's a basis for any mistrial."

At the conclusion of the Bench discussion, the cross-examination of Officer Conley was commenced and he was queried concerning his testimony at "a previous proceeding" when he testified that none of the fingerprints lifted at appellant's apartment were identifiable. He explained that he changed his testimony because when he checked again the morning of his testimony he learned, for the first time, that one of the fingerprints was identifiable. He further testified that he was not qualified to compare fingerprints.

Appellant, for the first time, in his brief in this court, makes it clear that the trial court error he relies upon for a reversal of his conviction and the granting of a new trial is based upon an alleged failure to comply with the requirements of Rule 25.-32(a)(9) that the state, without prior order, disclose all exculpatory evidence.

▇▇▇▇▇ As we have previously noted, this was not the subject of any objection directed to the trial court during trial when the evidence first came to light. No request for continuance nor for mistrial was made at that time. Therefore this Point was not preserved for review on these grounds. Nor, do we conclude, that the alleged trial court error is such, if it were error, that it constitutes "plain error" as the term is used in Rule 27.20(c).

Assuming, arguendo, that this fingerprint evidence was "exculpatory"—and we have serious doubts that it was—the question remains whether the failure of the state to disclose it was so prejudicial to the appellant that, in the absence of a request for sanctions or a continuance, appellant was the victim of manifest injustice or a miscarriage of justice.

Appellant argues that if his counsel had knowledge that this one fingerprint was identifiable several weeks prior to trial, his friends, if willing, could have been fingerprinted and a comparison of the prints could have been made.

We fail to see how a showing that this fingerprint was that of one of appellant's friends would, without more, be exculpatory. It would merely show that this friend, had at some time, been present in appellant's apartment and held this glass.

Under the facts in this record we hold that this Point is without merit.

Appellant's fifth, and final Point, is that the trial court erred in failing to grant him a new trial on the basis of newly discovered evidence.

Appellant filed a motion for new trial in which he alleged as one ground upon which the trial court should grant him a new trial was that a witness, "Myron Johnson, a former police officer" had been discovered, who allegedly saw the appellant on the night of the alleged crime and also saw the victim, Karen Terry, talking to a Negro male fitting the description given by appellant to police officers; that he first learned of this person shortly before trial, but all attempts to locate him were unsuccessful; that he'd received information of another address for this witness a week after his trial, and that his attorney made diligent and good faith efforts prior to trial to locate this witness and the witness' failure to attend was not due to coercion on his part, but to misinformation and lack of information as to the witness' whereabouts.

Appellant argues that this evidence would have created a reasonable doubt in the jurors' minds.

Respondent contends that this Point has not been preserved for appellate review because the appellant failed to incorporate into the record on review the testimony

adduced in support of his motion.[5] Respondent further argues that even were we to reach the merits of this Point, the trial court's denial of the motion for new trial on this ground was not error.

■ A trial court may grant a new trial on a number of grounds set out in Rule 27.19(a)(1); one of the grounds enumerated in the Rule is "for newly discovered evidence." Despite the fact that this remedy is not favored by the courts of this state, a new trial may be granted on this ground if the following factors are present: (1) new evidence has come to the knowledge of the movant after the trial; (2) movant's failure to discover such evidence prior to trial was not owing to a lack of diligence on his part; (3) the evidence is so material that it would probably produce a different result in a new trial; and, (4) the evidence is not merely cumulative or intended to impeach the testimony of a witness. *State v. Shaw*, 569 S.W.2d 375, 378[6] (Mo.App.1978); *State v. Lindley*, 545 S.W.2d 669, 672[8] (Mo.App. 1976).

■ We would initially point out that this evidence would be merely cumulative of the testimony of the appellant on this point, and we do not believe, therefore, it would be so material as to change the outcome of the case. A new trial is not automatically required when evidence disclosed after a trial might have been useful to the defense but is unlikely to change the verdict arrived at by the jury, *State v. Flauaus*, 515 S.W.2d 873, 880[16] (Mo.App. 1974), and that is certainly the case where, as here, the evidence was known and there was no request for a continuance for time to locate and produce this witness so his testimony could be adduced at trial pursuant to Rule 25.08. Had this been done the state might have admitted that Mr. Johnson would have so testified or, if it chose not to admit that he would, the trial court might have acted favorably on the request for continuance and given appellant the time necessary to obtain his testimony.

We find no merit to this Point and hold that the trial court did not err in denying appellant's motion for new trial on the grounds of newly discovered evidence.

Judgment affirmed.

STEWART and SNYDER, JJ., concur.

---

5. Appellant's counsel's attempts to argue matters de hors the record to excuse the lack of an affidavit in support of the motion for new trial on this point by stating that the witness, Myron Johnson, was present and willing to testify at the hearing on the motion for new trial in support of this ground for new trial but that the trial court informed her that it would not be necessary for Mr. Johnson to testify. There is nothing in the record to support this argument.