**Robert J. SETTLE, Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. WD 34189.**

Missouri Court of Appeals,
Western District.

Aug. 8, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Oct. 2, 1984.

Application to Transfer Denied Nov. 20, 1984.

James R. Wyrsch, Charles E. Atwell, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before LOWENSTEIN, P.J., and MANFORD and BERREY, JJ.

LOWENSTEIN, Presiding Judge.

The defendant Robert Settle appeals a jury conviction for felony possession of a Schedule II narcotic, hydromorphone, in violation of § 195.200.1(1) RSMo.1978. He received a sentence of seven years imprisonment. This opinion will first address the defendant's challenge to the admission into evidence, over his motion to suppress, of evidence claimed to be the fruit of an illegal stop and illegal search of the defendant's car.

Both parties rely upon the evidence adduced at the suppression hearing as well as that developed at trial. *See State v. Lane*, 613 S.W.2d 669, 674 (Mo.App.1981). The focus lies primarily on the transcript of the hearing on the motion to suppress for the facts surrounding this issue, *State v. Shelli*, 675 S.W.2d 79 (Mo.App.1984), although all evidence bearing on the question may be considered on appeal. *See State v. Hohensee*, 473 S.W.2d 379, 380 (Mo.1971).

On May 22, 1981 Sergeant Joseph McHale of the Kansas City, Missouri Police Department drove the night shift patrol in north Kansas City. He wore a uniform and carried a gun. He drove alone in an unmarked Plymouth police car having no emergency lights, sirens or markings identifying it as a Kansas City police car other than a spotlight on the driver's side.

Close to 2:00 a.m. McHale patroled through a Quik Trip parking lot, a convenience store that remained open at that

hour, on Highway 169 and Englewood Road in Clay County. He spotted a vehicle with Missouri license plates occupied by two women who appeared to be in their twenties. Another car, with Wyandotte County, Kansas plates, also drove into the lot. From the vantage point of a bank parking lot, McHale saw the two women leave their car and walk over to talk to the driver of the second car, defendant Settle, who appeared to be in his forties. The age difference between the two women and Settle, as well as the second car's out-of-state license plate, caught the officer's attention.

McHale watched as the two women walked over to Settle's car and then "promptly turned back around, got in their car, and proceeded to leave" without going into the store. He considered their behavior "strange." On cross-examination, he stated there· could have been laughter exchanged. McHale also did not think at this time that Settle was drunk nor did he see him drink anything.

The two women proceeded onto Broadway in their car, Settle followed, and McHale followed behind both of the two cars. After leaving the corporate limits of Kansas City and after having entered into the city of Gladstone, McHale observed Settle's car "[leave] the roadway on the shoulder going off the road" at one point on the 5700 block of North Broadway. He stated Settle's rear wheel went onto the road's shoulder. He considered this "to be an indication that [the defendant] possibly was driving under the influence" and notified his Kansas City dispatcher to request assistance from the Gladstone police. He did not state what facts, if any, were related to the dispatcher. Officer Coup of the Gladstone Police Department testified he had been dispatched "to back a Kansas City police officer on a car check, traffic violation ...." McHale stated on cross-examination that the lack of any emergency equipment on his car prevented him from stopping Settle's car on Broadway.

McHale continued following the two cars into the North Star Apartments. McHale stated on cross-examination that the de-

fendant had not committed any misdemeanor or felony, but believed a traffic violation in Gladstone had occurred. He had also checked Settle's license plate for wants or warrants before stopping. He stated he wished to talk to the defendant because he "felt him running off the road would give [him] probable cause to question him as to his sobriety ... during that time of the morning." Although his testimony states, "The vehicle was finally stopped at 6321 North Wyandotte," the only inference drawn from the evidence was the defendant stopped the car on his own, with McHale following shortly afterwards. When McHale was asked who was at the scene when the vehicle was stopped, he responded, "I requested Gladstone and Gladstone responded." The only inference to be drawn from the testimony, however, was that some interval of time transpired between his arrival· and the arrival of two Gladstone officers, Coup and Toman. McHale did not testify on direct examination regarding what specific actions he took before the arrival of the Gladstone officers. He did state no arrest occurred, and refers to having taken identification from the two women, running a computer check on them, and allowing them to leave before the arrival of the Gladstone officers. He does not specifically refer to having taken identification from the defendant, although he refers to running a computer check using the defendant's identification upon the arrival of the Gladstone officers. On cross-examination, McHale stated he had walked up to the defendant and received identification from all three persons. He had told the two women "to come back to him."

McHale testified Officer Coup arrived in "just a matter of minutes ... in ... a minute, maybe two minutes afterwards. That's an estimation." Officer Toman arrived in a separate car after Officer Coup. At McHale's direction, Officer Coup stood watching Settle while McHale continued checking Settle's identification, although problems with the computer had arisen. McHale did not state on direct what facts, if any, he related to the Gladstone officers regarding his reasons for stopping Settle.

On cross-examination, McHale stated, "I believe I told [the Gladstone officers] that [the defendant] had gone off the road" in Gladstone. Neither McHale or Coup related any observations of the defendant supporting McHale's suspicion that Settle had been drinking alcohol or was intoxicated.

Officer Coup continued to watch Settle, who stood carrying a can of pop in one hand. Coup then saw Settle reach into his pocket with his other hand and pull out some object he could not identify. Settle then threw the can of pop, along with the unidentified object, into a grassy area. Coup asked the other two officers to watch Settle while he retrieved whatever had just been thrown by the defendant. Coup looked and less than a foot away from the can of pop, found a prescription vial containing small yellow tablets and small plastic bags containing a white powdery substance. Trial testimony identified two of the yellow tablets as hydromorphone.

The defendant was then placed under arrest, frisked, and his car opened and searched. A search of the car produced a handgun lying on the floorboard of the car, a brown sack containing additional white plastic bags of white powdery substances, some syringes, and some black pills. The plastic bags appeared similar to those found in the prescription vial. A search of the defendant's person produced another plastic bag holding a white powdery substance. Except for the gun, which was not allowed into evidence, all of the seized items were entered into evidence over the defendant's objections. Only the small yellow tablets in the prescription vial thrown by Settle were found to be controlled substances. The contents of the vial formed the basis of the charge for which Settle was convicted. At trial the powdery substance was identified as "kiddie dope," a non-controlled substance.

At the Gladstone Police Headquarters, Officer Coup administered a breathalyzer test to the defendant after completing paperwork. The test came out as .01, well below the level considered as legally intoxicated. The officers issued a citation for careless and imprudent driving. Trial testimony indicated the citation was dismissed.

According to the defendant at the suppression hearing, on the evening in question Settle drove out to visit the women. One of the women, Brenda Langston, who testified on his behalf, had known Settle, through her husband, for approximately two years. She and her friend agreed to meet Settle at the Quik Trip parking lot after Settle telephoned to say he could not find her apartment using her directions. Settle denied going off the road with his car. The defendant testified that the car driven by the two women pulled into the North Star Apartments, in Gladstone, on the left side of a driveway leading into a yard area of the apartment complex. Settle pulled his car behind the first, and walked toward the two women before remembering his car was unlocked. He walked back and locked his car, and had returned to the first car when Officer McHale's car then pulled in on the left side of the driveway, next to Settle's. The defendant testified that McHale "pulled up and put a light in my face and said do you have some identification. I said yes, sir, I do. He said I want it." He also requested identification from the two women. When Brenda told him she did not have identification on her person but could obtain it from her apartment, McHale refused to allow her to get the identification and instead asked for and received her name and birthdate. McHale then called into his dispatcher with the names. The defendant stated he did not attempt to walk away from the area because McHale "was a policeman. He had a gun." Other than requesting the identification, McHale did not command him to halt or to freeze. Nor was he advised that he was being charged with anything. The two women were allowed to leave after having been checked out on the computer. The defendant testified he asked McHale why he had been stopped, and McHale responded, "for drunk driving." When the defendant protested, McHale said, "[Y]eah, you shut up and I'll ask the questions." According to the defendant, after the women left, McHale

asked Settle whether the two girls were prostitutes. He replied McHale should have asked the girls that when they were there. McHale denied asking the question about the girls being prostitutes.

It was at approximately this point, according to Settle's testimony, when the two Gladstone police officers, Coup and Toman, arrived in two marked vehicles. McHale stated that Officer Coup stood by to watch the defendant while McHale ran a computer check from his car. The two women had already departed. Computer problems had arisen before the defendant's name could be run through.

Settle admitted throwing the can of pop but denied any knowledge or possession of the prescription vial containing hydromorphone. He claimed that the syringes and non-controlled drugs in his car were used as sedatives for his German Shepherd dogs.

Settle attacks the denial of his motion to suppress by arguing that Sergeant McHale lacked the authority to arrest or to conduct an investigatory stop outside his territorial jurisdiction of Kansas City, Missouri. He also argues that McHale lacked probable cause or any articulable suspicion to stop Settle, violating the Fourth Amendment's [1] proscription against unreasonable searches and seizures, as well as Article I, Section 15 of the Missouri Constitution.[2] All of the seized evidence, he argues, is the fruit of the illegal stop.

■■■ The parties' initial dispute concerns whether or not McHale actually "seized" the person of the appellant so as to raise any Fourth Amendment concerns. A seizure of a person occurs whenever an officer by physical force or through a show of authority imposes an involuntary restraint upon an individual's liberty. *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968); *United States v.*

*Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Deprivations of individual liberty falling short of a full-scale arrest still raise Fourth Amendment concerns. Not every street encounter between police officers and private citizens, however, results in an actual or constructive restraint of liberty. *See, e.g., State v. Conti*, 573 S.W.2d 95, 98 (Mo.App.1978); *United States v. Mendenhall, supra.* The test as posed by the United States Supreme Court is whether under all of the surrounding circumstances, a reasonable person would have believed he was not free to leave. *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. "As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. The appellant here reasonably could have and did believe his option to walk away from McHale had been foreclosed. Detaining a person for the purpose of requiring identification has been held as a seizure. *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). Officer McHale wore a uniform and carried a gun. He shined a light in the appellant's face and positioned his car to restrict any exit path. Not only was Settle asked to produce identification, but was made to wait until a computer check ran through using his identification. When McHale permitted the two women to leave, but not the defendant, a reasonable and prudent person would interpret this to mean permission to leave must be obtained. The officer's conduct objectively told Settle that compliance was compelled. *See also United States v. Beck*, 602 F.2d 726, 728–729 (5th Cir.1979); *Commonwealth v. Williams*, 287 Pa.Super. 19, 429 A.2d 698, 702 (1981). Unlike *State v. Conti, supra*, the

---

1. U.S. Const. Amend. IV.

2. "That the people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures; and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the person or thing to be seized, as nearly as may be; nor without probable cause, supported by written oath or affirmation." Mo. Const. Art. I § 15.

officer's conduct here can hardly be considered inoffensive or his questioning innocuous. Respondent argues that if any stop occured, it was not until the Gladstone police officers arrived at the scene. The record compels a different conclusion. The Gladstone officers merely joined McHale, who had already succeeded in detaining Settle. At McHale's direction, Officer Coup watched the defendant; however, the defendant was no freer to leave before or after the arrival of the officers. His liberty had been restrained "as would under the Constitution require some particularized and objective justification." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877.

The next issues surround the undisputed fact of McHale leaving his territorial jurisdiction of Kansas City to follow the defendant. The parties differ as to the effect of the Kansas City officer's lack of statutory authority in Gladstone and the applicable standard that would render the officer's extraterritorial stop or arrest of the defendant as unreasonable.

 The statutory authority of Kansas City police officers extends only to the corporate boundaries and to municipal property located beyond city limits. Section 84.420 RSMo.1978 and Cumm.Supp. 1983. Kansas City police officers are both municipal and state officers, and are empowered to arrest for both ordinance and state violations "within the city or on public property of the city beyond the corporate limits thereof ...." Section 84.710 RSMo. 1978 and Cumm.Supp.1983. The status of "state officers" statutorily conferred upon Kansas City police officers subjects them to legislative control. *See American Fire Alarm Co. v. Board of Police Commissioners*, 285 Mo. 581, 227 S.W. 114 (1920). The creation in large metropolitan cities of a system of police force "constitute[s] a part of the measures adopted by the state to preserve peace, and protect the legal rights of persons." *American Fire Alarm Co., supra*, 227 S.W. at 116–117. Histori-

cally the statutory provisions circumscribing the duties and responsibilities of police have been interpreted as "[l]imiting the duty to arrest offenders as well as the power to do so ... The express provision in the act defining the duties of the officers must be treated as excluding any authority to perform other functions not embraced in the act ...." *State ex rel. McNamee v. Stobie*, 194 Mo. 14, 92 S.W. 191, 201 (banc 1906). These statutes authorizing warrantless arrests, being in derogation of liberty, are to be strictly construed. *Rodgers v. Schroeder*, 220 Mo.App. 575, 287 S.W. 861, 868 (1926).

 No argument can be made that McHale was in "hot pursuit" of Settle, since neither a chase nor the commission of a felony within McHale's territorial jurisdiction occurred. *See State v. Keeny*, 431 S.W.2d 95, 97 (Mo.1968). The legislature, exercising its authority over its "state officers," has defined the duties and responsibilities of Kansas City officers within the territorial boundaries of the city. The statutes embrace no authority to arrest or stop persons outside the territorial jurisdiction of the city (excluding city property), and therefore, must be interpreted as excluding such authority. *McNamee, supra*. When McHale left the territorial boundaries of Kansas City, his status transformed into that of a private citizen. *See State v. Fritz*, 490 S.W.2d 30, 32 (Mo.1973), *cert. denied*, 411 U.S. 985, 93 S.Ct. 2282, 36 L.Ed.2d 962 (1973); *State v. Goodman*, 449 S.W.2d 656, 659 (Mo.1970); *State v. Gay*, 629 S.W.2d 470, 473 (Mo.App.1981).

"In Missouri, a private citizen may make an arrest on a showing of commission of a felony and reasonable grounds to suspect the arrested party." *State v. Fritz*, 490 S.W.2d at 32. *See also Helming v. Adams*, 509 S.W.2d 159, 166 (Mo.App.1974). The common law also recognized this privilege of arrest to prevent an affray or breach of the peace.[3] *See, e.g. State v. Parker*, 378

---

**3.** "The Common Law further qualifies the authority of both the officer and the private citizen in misdemeanor arrests: the arrestee's conduct

must constitute a breach of peace or present an apparent immediate threat thereof." Scurlock,

S.W.2d 274 (Mo.App.1964) (citizen's arrest of sheriff to prevent an affray held not to constitute an unlawful force, *i.e.* an assault upon the sheriff, since the common law allowed private citizens the privilege to arrest to prevent a breach of the peace). Statutory authorization for misdemeanor arrests (other than breaches of the peace) by private citizens has also existed. *See, e.g., Frank v. Wabash Railroad Co.,* 295 S.W.2d 16 (Mo.1956) (involving the authority of private watchman to arrest for misdemeanors as a defense to a false arrest civil suit); Section 537.125 Cumm.Supp.1983 (the merchant's privilege).

▮ Although the respondent attempts to justify McHale's actions as a valid citizen's arrest, neither its evidence at trial or at the hearing, or its brief ever points to any misdemeanor offense that Settle was supposed to have violated. To the contrary, the radio dispatch to Gladstone mentioned only a traffic offense. McHale conceded on cross-examination no misdemeanor or felony had occurred, nor did he ever think one had occurred at the time he stopped Settle.

Respondent cites *State v. Rue,* 72 N.M. 212, 382 P.2d 697, 700 (1963); *City of Troy v. Cummins,* 107 Ohio App. 318, 159 N.E.2d 239, 242 (1958); and *State v. Jennings,* 112 Ohio App. 455, 176 N.E.2d 304, 307 (1959) to support the argument that driving while intoxicated constitutes a "breach of the peace." None of these cases, however, recognize a private citizen's privilege of arrest for traffic offenses.[4] Nothing in the record supports the state's other argument that a "possible affray" between the two women and defendant was about to develop, justifying McHale's detention under *State v. Parker, supra.* No authority can be found granting private citizens the privilege to stop and detain persons believed to have committed ordinance violations or traffic offenses, and the wisdom of recognizing such a privilege is seriously doubted. Delegating to private citizens the authority to investigate and arrest for such offense would invite more breaches of the peace than the number hoped to be prevented. *See Graham v. State,* 143 Ga. 440, 85 S.E. 328 (1915).

The second ingredient necessary to the common law privilege of arrest by a private citizen, *i.e.* probable cause, is also missing in the present case. In *State v. Fritz, supra,* a federal treasury agent who had no local law enforcement jurisdiction assisted the Kansas City police department on local calls. After hearing a police call alerting officers to prowlers inside a residence, the agent sighted a man running across the front yard of a home on the same block. The defendant's arrest by the agent was not tainted by the agent's lack of authority since his actions did not exceed those of a private citizen. A felony had been committed and reasonable grounds existed to suspect the arrested person.

In *State v. Gay, supra,* a University City Police officer followed into St. Louis (outside his statutory jurisdiction), a car whose passengers matched the description of two men believed to have burglarized a store in University City. Citing to *Fritz,* the court in upholding the arrests relied upon the fact a felony had been committed and that reasonable grounds existed to suspect the arrested persons. Under those circumstances even private citizens could have arrested the defendants. 629 S.W.2d at 473. Likewise, in *State v. Goodman, supra,* the court did not consider the officer's status as private or public as determinative of the legality of the defendant's arrest for a recent felony outside the officer's jurisdiction, as long as reasonable grounds existed to believe the arrested persons com-

Arrest in Missouri, 29 K.C.L.R. 115, 176–177 (1961).

**4.** In *State v. Rue, supra,* the court held that the jurisdiction of justices of the peace to hear cases involving breaches of the peace extends to offenses for driving while intoxicated. Both *City of Troy v. Cummins, supra* and *State v. Jennings, supra,* involved the issue whether operation of a motor vehicle fell within a statutory exception to privilege—from—arrest statutes. The courts both held that operating a motor vehicle fell within the exception for breaches of the peace.

mitted the offense. 449 S.W.2d at 659. The court also stated an arrest cannot be used as a pretext to search for evidence. *Id.* In *Goodman,* the city marshall received a report of two strangers walking on a public highway outside of a small town late at night after a burglary had occurred within the town of Lathrop. In overturning the conviction, the court held no reasonable grounds existed to believe the two strangers had committed the offense.

While an early morning perambulation along a public highway may not be a legal right usually exercised by the public in general, we are not wont to say that the mere discovery of a person so engaged, especially if he be otherwise unknown to the observer, constitutes probable cause or reasonably trustworthy information sufficient to warrant a prudent man in believing the pedestrian is guilty of having committed a felony. * * * "[T]he mere presence of an individual unknown to the police, in a suspicious place, can raise merely a suspicion that he has violated the law or committed a crime." (Citations omitted).

449 S.W.2d at 660.

▮ In contrast to *Fritz, Gay,* and *Goodman,* Sergeant McHale did not have knowledge of the commission of any offense when he left the territorial jurisdiction of Kansas City. He left his jurisdiction armed with bare suspicions tied to age differences, an out-of-state license plate and behavior he considered "strange" but lacking the necessary ingredient of probable cause. One isolated instance of the rear wheel leaving the road during the course of several blocks does not rise to the level of probable cause that the driver was intoxicated, especially when McHale's prior firsthand observations failed to support such a suspicion. Neither did any observations of the defendant at the North Star Apartments indicate he was intoxicated. McHale's actions contradict the motives claimed to underlie his actions, affirming the conclusion that his suspicions served merely as a pretext to proceed on a nocturnal fishing expedition outside of his jurisdiction. *State v. Goodman, supra,* at 660. McHale also claimed to have legitimate concerns for the safety of the two women. His actions uncovered different concerns. He abandoned the opportunity at the Quik Trip to simply ask the women whether they were all right in favor of stalking the entire scenario. At the North Star Apartments, he demanded identification not only from the defendant but from the supposed potential victims, and asked whether they were prostitutes. Although his car was equipped with a spotlight, he made no attempt to stop the car claimed to be operating dangerously. When the car stopped at the apartments, he demanded identification not only from the driver of the car believed to have committed the traffic offense, but also from the driver and passenger of the other car he followed.

▮ Relying upon *People v. Hamilton,* 666 P.2d 152 (Colo.1983) (banc), respondent argues that even if the defendant's arrest outside the territorial limit of McHale's authority resulted in a statutory violation, the exclusionary rule is not necessarily available as a remedy. In *Hamilton,* officers from the town of Golden executed an arrest warrant for the defendant in Denver, outside their territorial authority. The warrant established the probable cause for the defendant's arrest, 666 P.2d at 156, and the court concluded that under the circumstances the officers' conduct was not so unreasonable as to violate the protection against unreasonable searches and seizures. While this court recognizes that "violations of statutory provisions are not *per se* violations of constitutionally protected rights," *Hamilton,* 666 P.2d at 156 (citations omitted) (emphasis added), a different conclusion is reached under this set of circumstances. In *Hamilton,* the arrest warrant provided the probable cause to arrest the defendant. Unlike *Hamilton,* the officer here lacked any probable cause upon which to arrest the defendant. *See Goodman, supra,* at 659. Whether or not Officer McHale would have been authorized under *Terry v. Ohio* to briefly detain the appellant had a "stop" occurred before en-

tering into Gladstone misses the point. The "articulable suspicion" justifying a *Terry* type stop cannot support an arrest by a private citizen, which must rest upon the commission of a felony, *Fritz, supra,* or breach of the peace, *Parker, supra,* and reasonable grounds to believe the arrested person committed the offense. The state's argument would allow the broad statutory powers conferred upon Kansas City officers to apply outside their territorial jurisdiction. McHale's extraterritorial authority, absent hot pursuit, had been restricted, not enlarged.

The state further argues that because the illegal contraband was undiscovered until after the arrival of the Gladstone officers, this court should conclude the discovery resulted from a second lawful stop, not the first. They argue any prior illegal stop by McHale should not taint the second lawful stop.

In *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the Supreme Court decided that not all evidence will be considered as "the fruit of the poisonous tree" simply because "but for" the illegal actions of police officers the evidence would not have come to light. Assuming the primary illegality of the police conduct, the proper focus is whether the evidence has been discovered through an exploitation of the illegality or instead through means sufficiently distinguishable to be purged of any taint. 83 S.Ct. at 417.

Under the present circumstances, the continuation of the defendant's detention by the Gladstone officers did not purge the illegality of the detention by McHale. The discovery of the evidence resulted from an exploitation of an illegal detention unsupported by probable cause. Unlike *United States v. Walker,* 535 F.2d 896, 898 (5th Cir.1976) and *United States v. Pimental,* 645 F.2d 85, 86 (1st Cir.1981), both cited by the respondent, no independent observation by the intervening officers amounting to probable cause had occurred. The Gladstone officers merely acted as conduits for the continued detention of the defendant based upon a radio dispatch initiated by McHale. In *Walker,* the intervening officer had independently investigated the facts surrounding an alleged forgery prior to arresting the defendant. The court held the probable cause inquiry could properly focus upon the second arrest under those particular circumstances. The court carefully distinguished the situation present here where arresting officers act in reliance upon another officer's knowledge without sufficient personal knowledge constituting probable cause. *State v. Phillips,* 140 Vt. 210, 436 A.2d 746, 750 (1981), also cited by the respondent, is distinguishable upon the same basis. Prior to the search involved in *Phillips,* a trooper had arrived at the scene where the defendant was being illegally detained, armed with facts amounting to probable cause. Because the same cannot be said of the Gladstone officers, their intervention did not "purge" the illegality of the defendant's initial detention by McHale. *See Hardinge v. State,* 500 S.W.2d 870 (Tex.Cr.App.1973).

Inextricably tied to the facts and issue here is the question of whether an abandonment occurred when Settle threw the prescription vial. An abandonment brings the right of privacy to an end, removing any Fourth Amendment complaint about the seizure and introduction in evidence of the abandoned property. "In short the theory of abandonment is that no search is presented in such a situation, and the property so abandoned may be seized without probable cause." Mascolo, The Rule of Abandonment in the Law of Search and Seizure: An Application of Misdirected Emphasis, 20 Buff.L.Rev. 399, 400–01 (1971).

The issue common to the validity of the arrest and any theory of abandonment is that of the requirement of probable cause. An officer, without probable cause and acting strictly on a hunch or suspicion, who hounds an individual and harasses him into discarding contraband brings to the fore a constitutional question. The police by coercion (overbearing conduct without probable cause) cannot force an individual

to abandon his right to privacy and use the evidence against him. This would allow the police to do indirectly what could not be accomplished directly. *Mascolo, supra,* at 416–17; LaFave, Search and Seizure, Vol. 1, 373–74 (1978). Property thrown away due to the unlawful activities of police officers is not to be considered abandoned. *State v. Reed,* 284 So.2d 574, 575 (La.1973). A warrantless arrest by a peace officer requires probable cause. *State v. Berry,* 609 S.W.2d 948, 952 (Mo. banc 1981). Probable cause must exist for a citizen's arrest. In *State v. Berry, supra,* an officer after discovering the defendant trespassing behind a bush, gave chase to the person who had acted "in a highly suspicious manner" and fit the description of a suspect in recent felonies. An article thrown by the defendant during the chase was not suppressed.

▮ Here there was a uniformed policeman out of his jurisdiction acting like a policeman but having only the arrest powers of a private citizen. As stated earlier he had no probable cause that *any* crime had been committed. *State v. Cuezze,* 249 S.W.2d 373, 375 (Mo.1952). The state has shown no felony or misdemeanor statute that existed for McHale to have probable cause to make a citizen's arrest. The illegality of McHale's "police-like" actions prompted the disposal and if allowed to stand would encourage illegal stops. *La-Fave, supra,* (Cumm.Supp.1984 n. 56 at 103). The link here between the "police activity" of McHale *i.e.,* dressed like a policeman, restraining the accused, asking for ID, running ID's through a computer from a radio in his car, or considering his activities merely as a private citizen, and the abandonment is too direct and proximate to permit a finding of attenuation from illegality. *Wong Sun v. United States, supra.*

Although involving police activity within their jurisdiction, the rationale in *United States v. Beck, supra,* applies to this case. There the police on routine patrol saw two men sitting in a car in a high crime area. The officers questioned the men and pulled their car closer to get out to question further. Contraband was then discarded. The court held the police had effectively restrained the defendant: he was not free to ignore the officer and in the totality of the circumstances had been stopped. Such a stop opined the court could only be lawful if based on reasonable suspicion. 602 F.2d at 729. Under the facts, the stop was illegal and the subsequent abandonment not voluntary but compelled by the illegal stop. *Id.* at 729. While a voluntary abandonment can remove the taint of an illegal stop or arrest, "it is equally true that for this to occur the abandonment must be truly voluntary and not merely the product of police misconduct." *Id.* at 729–30. *See U.S. v. Morin,* 665 F.2d 765 (5th Cir.1982).

▮ In a letter filed after argument the state presented several theories to uphold the conviction. With citations of authority the state raised the abandonment theory and several others for the first time, not having mentioned or discussed them in respondent's brief. This prompted the appellant to counteract with a three page letter replete with authority. This is precisely what this court decried in *State v. Taylor,* 661 S.W.2d 794, 800 (Mo.App.1983). Unfair and not to be tolerated is the state's presenting new arguments or theories after the filing of its respondent's brief. Supplementation of briefs is not the question, it is the presentation of new matters, such as the abandonment theory, after briefing, that is unfair to the appellant. New points, not specifically mentioned and covered in the brief, will not be considered after briefing by this court.

The Motion to Suppress the evidence for which the defendant was charged should have been sustained. The admission of the hydromorphone into evidence was prejudicial error. The defendant was charged with no other crime—this evidence cannot be used against him causing the judgment to be reversed and the defendant ordered discharged. *Kansas City v. Butters,* 507 S.W.2d 49, 55 (Mo.App.1974).

All concur.